(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KANSAS *v.* GLOVER

### CERTIORARI TO THE SUPREME COURT OF KANSAS

No. 18–556. Argued November 4, 2019—Decided April 6, 2020

A Kansas deputy sheriff ran a license plate check on a pickup truck, discovering that the truck belonged to respondent Glover and that Glover's driver's license had been revoked. The deputy pulled the truck over because he assumed that Glover was driving. Glover was in fact driving and was charged with driving as a habitual violator. He moved to suppress all evidence from the stop, claiming that the deputy lacked reasonable suspicion. The District Court granted the motion, but the Court of Appeals reversed. The Kansas Supreme Court in turn reversed, holding that the deputy violated the Fourth Amendment by stopping Glover without reasonable suspicion of criminal activity.

*Held*: When the officer lacks information negating an inference that the owner is driving the vehicle, an investigative traffic stop made after running a vehicle's license plate and learning that the registered owner's driver's license has been revoked is reasonable under the Fourth Amendment. Pp. 3–10.

(a) An officer may initiate a brief investigative traffic stop when he has "a particularized and objective basis" to suspect legal wrongdoing. *United States* v. *Cortez*, 449 U. S. 411, 417. The level of suspicion required is less than that necessary for probable cause and "depends on ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' " *Prado Navarette* v. *California*, 572 U. S. 393, 402. Courts must therefore permit officers to make "commonsense judgments and inferences about human behavior." *Illinois* v. *Wardlow*, 528 U. S. 119, 125. P. 3.

(b) Here, the deputy's commonsense inference that the owner of a vehicle was likely the vehicle's driver provided more than reasonable suspicion to initiate the stop. That inference is not made unreasonable merely because a vehicle's driver is not always its registered owner or because Glover had a revoked license. Though common sense suffices

to justify the officer's inference, empirical studies demonstrate that drivers with suspended or revoked licenses frequently continue to drive. And Kansas' license-revocation scheme, which covers drivers who have already demonstrated a disregard for the law or are categorically unfit to drive, reinforces the reasonableness of the inference that an individual with a revoked license will continue to drive. Pp. 4–6.

(c) Glover's counterarguments are unpersuasive. He argues that the deputy's inference was unreasonable because it was not grounded in his law enforcement training or experience. Such a requirement, however, is inconsistent with this Court's Fourth Amendment jurisprudence. See, *e.g., Navarette*, 572 U. S., at 402. It would also place the burden on police officers to justify their inferences by referring to training materials or experience, and it would foreclose their ability to rely on common sense obtained outside of their work duties. Glover's argument that Kansas' view would permit officers to base reasonable suspicion exclusively on probabilities also carries little force. Officers, like jurors, may rely on probabilities in the reasonable suspicion context. See, *e.g., United States* v. *Sokolow*, 490 U. S. 1, 8–9. Moreover, the deputy here did more than that: He combined facts obtained from a database and commonsense judgments to form a reasonable suspicion that a specific individual was potentially engaged in specific criminal activity. Pp. 6–8.

(d) The scope of this holding is narrow. The reasonable suspicion standard "'takes into account the totality of the circumstances.'" *Navarette*, 572 U. S., at 397. The presence of additional facts might dispel reasonable suspicion, but here, the deputy possessed no information sufficient to rebut the reasonable inference that Glover was driving his own truck. P. 9.

308 Kan. 590, 422 P. 3d 64, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, ALITO, KAGAN, GORSUCH, and KAVANAUGH, JJ., joined. KAGAN, J., filed a concurring opinion, in which GINSBURG, J., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–556

KANSAS, PETITIONER *v.* CHARLES GLOVER

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[April 6, 2020]

JUSTICE THOMAS delivered the opinion of the Court.

This case presents the question whether a police officer violates the Fourth Amendment by initiating an investigative traffic stop after running a vehicle's license plate and learning that the registered owner has a revoked driver's license. We hold that when the officer lacks information negating an inference that the owner is the driver of the vehicle, the stop is reasonable.

I

Kansas charged respondent Charles Glover, Jr., with driving as a habitual violator after a traffic stop revealed that he was driving with a revoked license. See Kan. Stat. Ann. §8–285(a)(3) (2001). Glover filed a motion to suppress all evidence seized during the stop, claiming that the officer lacked reasonable suspicion. Neither Glover nor the police officer testified at the suppression hearing. Instead, the parties stipulated to the following facts:

"1. Deputy Mark Mehrer is a certified law enforcement officer employed by the Douglas County Kansas Sheriff's Office.
2. On April 28, 2016, Deputy Mehrer was on routine patrol in Douglas County when he observed a 1995

Chevrolet 1500 pickup truck with Kansas plate 295ATJ.

3. Deputy Mehrer ran Kansas plate 295ATJ through the Kansas Department of Revenue's file service. The registration came back to a 1995 Chevrolet 1500 pickup truck.

4. Kansas Department of Revenue files indicated the truck was registered to Charles Glover Jr. The files also indicated that Mr. Glover had a revoked driver's license in the State of Kansas.

5. Deputy Mehrer assumed the registered owner of the truck was also the driver, Charles Glover Jr.

6. Deputy Mehrer did not observe any traffic infractions, and did not attempt to identify the driver [of] the truck. Based solely on the information that the registered owner of the truck was revoked, Deputy Mehrer initiated a traffic stop.

7. The driver of the truck was identified as the defendant, Charles Glover Jr." App. to Pet. for Cert. 60–61.

The District Court granted Glover's motion to suppress. The Court of Appeals reversed, holding that "it was reasonable for [Deputy] Mehrer to infer that the driver was the owner of the vehicle" because "there were specific and articulable facts from which the officer's common-sense inference gave rise to a reasonable suspicion." 54 Kan. App. 2d 377, 385, 400 P. 3d 182, 188 (2017).

The Kansas Supreme Court reversed. According to the court, Deputy Mehrer did not have reasonable suspicion because his inference that Glover was behind the wheel amounted to "only a hunch" that Glover was engaging in criminal activity. 308 Kan. 590, 591, 422 P. 3d 64, 66 (2018). The court further explained that Deputy Mehrer's "hunch" involved "applying and stacking unstated assumptions that are unreasonable without further factual basis," namely, that "the registered owner was likely the primary

driver of the vehicle" and that "the owner will likely disregard the suspension or revocation order and continue to drive." *Id.,* at 595–597, 422 P. 3d, at 68–70. We granted Kansas' petition for a writ of certiorari, 587 U. S. \_\_\_ (2019), and now reverse.

II

Under this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States* v. *Cortez*, 449 U. S. 411, 417–418 (1981); see also *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette* v. *California*, 572 U. S. 393, 397 (2014) (quotation altered); *United States* v. *Sokolow*, 490 U. S. 1, 7 (1989).

Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama* v. *White*, 496 U. S. 325, 330 (1990). The standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Navarette, supra*, at 402 (quoting *Ornelas* v. *United States*, 517 U. S. 690, 695 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty . . . where none exists." *Illinois* v. *Wardlow*, 528 U. S. 119, 125 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; see also *Navarette, supra*, at 403 (noting that an officer "'need not rule out the possibility of innocent conduct'").

### III

We have previously recognized that States have a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles [and] that licensing, registration, and vehicle inspection requirements are being observed." *Delaware* v. *Prouse*, 440 U. S. 648, 658 (1979). With this in mind, we turn to whether the facts known to Deputy Mehrer at the time of the stop gave rise to reasonable suspicion. We conclude that they did.

Before initiating the stop, Deputy Mehrer observed an individual operating a 1995 Chevrolet 1500 pickup truck with Kansas plate 295ATJ. He also knew that the registered owner of the truck had a revoked license and that the model of the truck matched the observed vehicle. From these three facts, Deputy Mehrer drew the commonsense inference that Glover was likely the driver of the vehicle, which provided more than reasonable suspicion to initiate the stop.

The fact that the registered owner of a vehicle is not always the driver of the vehicle does not negate the reasonableness of Deputy Mehrer's inference. Such is the case with all reasonable inferences. The reasonable suspicion inquiry "falls considerably short" of 51% accuracy, see *United States* v. *Arvizu*, 534 U. S. 266, 274 (2002), for, as we have explained, "[t]o be reasonable is not to be perfect," *Heien* v. *North Carolina*, 574 U. S. 54, 60 (2014).

Glover's revoked license does not render Deputy Mehrer's inference unreasonable either. Empirical studies demonstrate what common experience readily reveals: Drivers with revoked licenses frequently continue to drive and therefore to pose safety risks to other motorists and pedestrians. See, *e.g.*, 2 T. Neuman et al., National Coop. Hwy. Research Program Report 500: A Guide for Addressing Collisions Involving Unlicensed Drivers and Drivers With Suspended or Revoked Licenses, p. III–1 (2003) (noting that 75% of drivers with suspended or revoked licenses continue

to drive); National Hwy. and Traffic Safety Admin., Research Note: Driver License Compliance Status in Fatal Crashes 2 (Oct. 2014) (noting that approximately 19% of motor vehicle fatalities from 2008–2012 "involved drivers with invalid licenses").

Although common sense suffices to justify this inference, Kansas law reinforces that it is reasonable to infer that an individual with a revoked license may continue driving. The State's license-revocation scheme covers drivers who have already demonstrated a disregard for the law or are categorically unfit to drive. The Division of Vehicles of the Kansas Department of Revenue (Division) "shall" revoke a driver's license upon certain convictions for involuntary manslaughter, vehicular homicide, battery, reckless driving, fleeing or attempting to elude a police officer, or conviction of a felony in which a motor vehicle is used. Kan. Stat. Ann. §§8–254(a), 8–252. Reckless driving is defined as "driv[ing] any vehicle in willful or wanton disregard for the safety of persons or property." §8–1566(a). The Division also has discretion to revoke a license if a driver "[h]as been convicted with such frequency of serious offenses against traffic regulations governing the movement of vehicles as to indicate a disrespect for traffic laws and a disregard for the safety of other persons on the highways," "has been convicted of three or more moving traffic violations committed on separate occasions within a 12-month period," "is incompetent to drive a motor vehicle," or "has been convicted of a moving traffic violation, committed at a time when the person's driving privileges were restricted, suspended[,] or revoked." §§8–255(a)(1)–(4). Other reasons include violating license restrictions, §8–245(c), being under house arrest, §21–6609(c), and being a habitual violator, §8–286, which Kansas defines as a resident or nonresident who has been convicted three or more times within the past five years of certain enumerated driving offenses, §8–285. The

concerns motivating the State's various grounds for revocation lend further credence to the inference that a registered owner with a revoked Kansas driver's license might be the one driving the vehicle.

## IV

Glover and the dissent respond with two arguments as to why Deputy Mehrer lacked reasonable suspicion. Neither is persuasive.

## A

First, Glover and the dissent argue that Deputy Mehrer's inference was unreasonable because it was not grounded in his law enforcement training or experience. Nothing in our Fourth Amendment precedent supports the notion that, in determining whether reasonable suspicion exists, an officer can draw inferences based on knowledge gained only through law enforcement training and experience. We have repeatedly recognized the opposite. In *Navarette*, we noted a number of behaviors—including driving in the median, crossing the center line on a highway, and swerving—that as a matter of common sense provide "sound indicia of drunk driving." 572 U. S., at 402. In *Wardlow*, we made the unremarkable observation that "[h]eadlong flight— wherever it occurs—is the consummate act of evasion" and therefore could factor into a police officer's reasonable suspicion determination. 528 U. S., at 124. And in *Sokolow*, we recognized that the defendant's method of payment for an airplane ticket contributed to the agents' reasonable suspicion of drug trafficking because we "fe[lt] confident" that "[m]ost business travelers . . . purchase airline tickets by credit card or check" rather than cash. 490 U. S., at 8–9. So too here. The inference that the driver of a car is its registered owner does not require any specialized training; rather, it is a reasonable inference made by ordinary people on a daily basis.

The dissent reads our cases differently, contending that they permit an officer to use only the common sense derived from his "experiences in law enforcement." *Post*, at 5 (opinion of SOTOMAYOR, J.). Such a standard defies the "common sense" understanding of common sense, *i.e.*, information that is accessible to people generally, not just some specialized subset of society. More importantly, this standard appears nowhere in our precedent. In fact, we have stated that reasonable suspicion is an "abstract" concept that cannot be reduced to "a neat set of legal rules," *Arvizu*, 534 U. S., at 274 (internal quotation marks omitted), and we have repeatedly rejected courts' efforts to impose a rigid structure on the concept of reasonableness, *ibid.*; *Sokolow*, 490 U. S., at 7–8. This is precisely what the dissent's rule would do by insisting that officers must be treated as bifurcated persons, completely precluded from drawing factual inferences based on the commonly held knowledge they have acquired in their everyday lives.

The dissent's rule would also impose on police the burden of pointing to specific training materials or field experiences justifying reasonable suspicion for the myriad infractions in municipal criminal codes. And by removing common sense as a source of evidence, the dissent would considerably narrow the daylight between the showing required for probable cause and the "less stringent" showing required for reasonable suspicion. *Prouse*, 440 U. S., at 654; see *White*, 496 U. S., at 330. Finally, it would impermissibly tie a traffic stop's validity to the officer's length of service. See *Devenpeck* v. *Alford*, 543 U. S. 146, 154 (2004). Such requirements are inconsistent with our Fourth Amendment jurisprudence, and we decline to adopt them here.

In reaching this conclusion, we in no way minimize the significant role that specialized training and experience routinely play in law enforcement investigations. See, *e.g.*, *Arvizu*, 534 U. S., at 273–274. We simply hold that such experience is not *required* in every instance.

B

Glover and the dissent also contend that adopting Kansas' view would eviscerate the need for officers to base reasonable suspicion on "specific and articulable facts" particularized to the individual, see *Terry*, 392 U. S., at 21, because police could instead rely exclusively on probabilities. Their argument carries little force.

As an initial matter, we have previously stated that officers, like jurors, may rely on probabilities in the reasonable suspicion context. See *Sokolow*, 490 U. S., at 8–9; *Cortez*, 449 U. S., at 418. Moreover, as explained above, Deputy Mehrer did not rely exclusively on probabilities. He knew that the license plate was linked to a truck matching the observed vehicle and that the registered owner of the vehicle had a revoked license. Based on these minimal facts, he used common sense to form a reasonable suspicion that a specific individual was potentially engaged in specific criminal activity—driving with a revoked license. Traffic stops of this nature do not delegate to officers "broad and unlimited discretion" to stop drivers at random. *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 882 (1975). Nor do they allow officers to stop drivers whose conduct is no different from any other driver's. See *Brown* v. *Texas*, 443 U. S. 47, 52 (1979). Accordingly, combining database information and commonsense judgments in this context is fully consonant with this Court's Fourth Amendment precedents.[1]

———————

[1] The dissent contends that this approach "pave[s] the road to finding reasonable suspicion based on nothing more than a demographic profile." *Post*, at 6–7 (opinion of SOTOMAYOR, J.). To alleviate any doubt, we reiterate that the Fourth Amendment requires, and Deputy Mehrer had, an individualized suspicion that a particular citizen was engaged in a particular crime. Such a particularized suspicion would be lacking in the dissent's hypothetical scenario, which, in any event, is already prohibited by our precedents. See *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 876 (1975) (holding that it violated the Fourth Amendment to stop and "question [a vehicle's] occupants [about their immigration status] when the only ground for suspicion [was] that the occupants appear[ed] to be

## V

This Court's precedents have repeatedly affirmed that "'the ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Heien*, 574 U. S., at 60 (quoting *Riley* v. *California*, 573 U. S. 373, 381 (2014)). Under the totality of the circumstances of this case, Deputy Mehrer drew an entirely reasonable inference that Glover was driving while his license was revoked.

We emphasize the narrow scope of our holding. Like all seizures, "[t]he officer's action must be 'justified at its inception.'" *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U. S. 177, 185 (2004) (quoting *United States* v. *Sharpe*, 470 U. S. 675, 682 (1985)). "The standard takes into account the totality of the circumstances—the whole picture." *Navarette*, 572 U. S., at 397 (internal quotation marks omitted). As a result, the presence of additional facts might dispel reasonable suspicion. See *Terry, supra*, at 28. For example, if an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties, then the totality of the circumstances would not "raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U. S., at 418; *Ornelas*, 517 U. S., at 696 ("'[e]ach case is to be decided on its own facts and circumstances'" (quoting *Ker* v. *California*, 374 U. S. 23, 33 (1963))). Here, Deputy Mehrer possessed no exculpatory information—let alone sufficient information to rebut the reasonable inference that Glover was driving his own truck—and thus the stop was justified.[2]

---

of Mexican ancestry").

  [2] The dissent argues that this approach impermissibly places the burden of proof on the individual to negate the inference of reasonable suspicion. *Post*, at 3. Not so. As the above analysis makes clear, it is the information possessed by *the officer* at the time of the stop, not any information offered by the individual after the fact, that can negate the inference.

\*     \*     \*

For the foregoing reasons, we reverse the judgment of the Kansas Supreme Court, and we remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———

No. 18–556

———

## KANSAS, PETITIONER *v.* CHARLES GLOVER

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[April 6, 2020]

JUSTICE KAGAN, with whom JUSTICE GINSBURG joins, concurring.

When you see a car coming down the street, your common sense tells you that the registered owner may well be behind the wheel. See *ante,* at 4, 9. Not always, of course. Families share cars; friends borrow them. Still, a person often buys a vehicle to drive it himself. So your suspicion that the owner is driving would be perfectly reasonable. See *ibid.*

Now, though, consider a wrinkle: Suppose you knew that the registered owner of the vehicle no longer had a valid driver's license. That added fact raises a new question. What are the odds that someone who has lost his license would continue to drive? The answer is by no means obvious. You might think that a person told not to drive on pain of criminal penalty would obey the order—so that if his car was on the road, someone else (a family member, a friend) must be doing the driving. Or you might have the opposite intuition—that a person's reasons for driving would overcome his worries about violating the law, no matter the possible punishment. But most likely (let's be honest), you just wouldn't know. Especially if you've not had your own license taken away, your everyday experience has given you little basis to assess the probabilities. Your common sense can therefore no longer guide you.

Even so, Deputy Mark Mehrer had reasonable suspicion to stop the truck in this case, and I join the Court's opinion

holding as much. Crucially for me, Mehrer knew yet one more thing about the vehicle's registered owner, and it related to his proclivity for breaking driving laws. As the Court recounts, Mehrer learned from a state database that Charles Glover, the truck's owner, had had his license revoked under Kansas law. See *ante,* at 2. And Kansas almost never revokes a license except for serious or repeated driving offenses. See Kan. Stat. Ann. §8–254 (2001); *ante,* at 5. Crimes like vehicular homicide and manslaughter, or vehicular flight from a police officer, provoke a license revocation; so too do multiple convictions for moving traffic violations within a short time. See *ante,* at 5. In other words, a person with a revoked license has already shown a willingness to flout driving restrictions. That fact, as the Court states, provides a "reason[] to infer" that such a person will drive without a license—at least often enough to warrant an investigatory stop. *Ibid.* And there is nothing else here to call that inference into question. That is because the parties' unusually austere stipulation confined the case to the facts stated above—*i.e.,* that Mehrer stopped Glover's truck because he knew that Kansas had revoked Glover's license.

But as already suggested, I would find this a different case if Kansas had barred Glover from driving on a ground that provided no similar evidence of his penchant for ignoring driving laws. Consider, for example, if Kansas had suspended rather than revoked Glover's license. Along with many other States, Kansas suspends licenses for matters having nothing to do with road safety, such as failing to pay parking tickets, court fees, or child support. See Kan. Stat. Ann. §8–2110(b) (2018 Cum. Supp.); see also, *e.g.*, N. J. Stat. Ann. §39:4–139.10 (West Supp. 2019); Ark. Code Ann. §9–14–239 (Supp. 2019). Indeed, several studies have found that most license suspensions do not relate to driving at all; what they most relate to is being poor. See Brief for Fines and Fees Justice Center et al. as *Amici Curiae* 7. So the good reason the Court gives for thinking that someone

with a revoked license will keep driving—that he has a history of disregarding driving rules—would no longer apply. And without that, the case for assuming that an unlicensed driver is at the wheel is hardly self-evident. It would have to rest on an idea about the frequency with which even those who had previously complied with driving laws would defy a State's penalty-backed command to stay off the roads. But where would that idea come from? As discussed above, I doubt whether our collective common sense could do the necessary work. See *supra,* at 1. Or otherwise said, I suspect that any common sense invoked in this altered context would not much differ from a "mere 'hunch'"—and so "not create reasonable suspicion." *Prado Navarette* v. *California*, 572 U. S. 393, 397 (2014) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 27 (1968)).

And even when, as under the revocation scheme here, a starting presumption of reasonable suspicion makes sense, the defendant may show that in his case additional information dictates the opposite result. The Court is clear on this point, emphasizing that under the applicable totality-of-the-circumstances test, "the presence of additional facts might dispel reasonable suspicion" even though an officer knows that a car on the road belongs to a person with a revoked license. *Ante,* at 9; see *ante,* at 1 (stating that further information may "negat[e] an inference that the owner is the driver of the vehicle"). Just as the Court once said of a trained drug-detection dog's "alert," the license-revocation signal is always subject to a defendant's challenge, whether through cross-examination of the officer or introduction of his own fact or expert witnesses. *Florida* v. *Harris*, 568 U. S. 237, 247 (2013).

That challenge may take any number of forms. The Court offers a clear example of observational evidence dispelling reasonable suspicion: if the officer knows the registered owner of a vehicle is an elderly man, but can see the driver is a young woman. See *ante,* at 9. Similarly (if not as cut-

and-dry), when the officer learns a car has two or more registered owners, the balance of circumstances may tip away from reasonable suspicion that the one with the revoked license is driving. And so too, the attributes of the car may be relevant. Consider if a car bears the markings of a peer-to-peer carsharing service; or compare the likelihoods that someone other than the registered owner is driving (1) a family minivan and (2) a Ferrari. The officer himself may have a wealth of accumulated information about such matters, and the defendant may probe what that knowledge suggests about the stop at issue.

Such a challenge may also use statistical evidence, which is almost daily expanding in sophistication and scope. States or municipalities often keep information about "hit rates" in stops like this one—in other words, the frequency with which those stops discover unlicensed drivers behind the wheel. See generally Brief for Andrew Manuel Crespo as *Amicus Curiae* 23–27. Somewhat less direct but also useful are state and local data (collected by governments, insurance companies, and academics alike) about the average number of drivers for each registered automobile and the extent to which unlicensed persons continue to drive. See *id.,* at 13–18. (If, to use an extreme example, every car had 10 associated drivers, and losing a license reduced driving time by 90%, an officer would not have reasonable suspicion for a stop.) Here too, defendants may question testifying officers about such information. Indeed, an officer may have his own hit rate, which if low enough could itself negate reasonable suspicion. See, *e.g.*, *United States* v. *Cortez-Galaviz*, 495 F. 3d 1203, 1208–1209 (CA10 2007) (Gorsuch, J.) (considering, as part of the reasonable suspicion inquiry, the frequency of an officer's misses and the accuracy of the database on which he relied).*

———————

*Of course, aggregate statistics of this kind cannot substitute for the individualized suspicion that the Fourth Amendment requires. See, *e.g.,*

In this strange case, contested on a barebones stipulation, the record contains no evidence of these kinds.  There is but a single, simple fact: A police officer learned from a state database that a car on the road belonged to a person with a revoked license.  Given that revocations in Kansas nearly always stem from serious or repeated driving violations, I agree with the Court about the reasonableness of the officer's inference that the owner, "Glover[,] was driving while his license was revoked." *Ante,* at 9.  And because Glover offered no rebuttal, there the matter stands.  But that does not mean cases with more complete records will all wind up in the same place.  A defendant like Glover may still be able to show that his case is different—that the "presence of additional facts" and circumstances "dispel[s] reasonable suspicion." *Ibid.*  Which is to say that in more fully litigated cases, the license-revocation alert does not (as it did here) end the inquiry.  It is but the first, though no doubt an important, step in assessing the reasonableness of the officer's suspicion.

———————

*Terry* v. *Ohio*, 392 U. S. 1, 21, n. 18 (1968) ("Th[e] demand for specificity . . . is the central teaching of this Court's Fourth Amendment jurisprudence").  But in a case like this one, the officer's suspicion *is* individualized: It arises from the license status of the known owner of a specific car.  The only question is whether that suspicion is reasonable—whether, in other words, there is enough to back up the officer's belief that the owner is driving the vehicle.  As to that matter, statistics may be highly relevant, either to support or to cast doubt on the officer's judgment.

# SUPREME COURT OF THE UNITED STATES

---

No. 18–556

---

## KANSAS, PETITIONER *v.* CHARLES GLOVER

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[April 6, 2020]

JUSTICE SOTOMAYOR, dissenting.

In upholding routine stops of vehicles whose owners have revoked licenses, the Court ignores key foundations of our reasonable-suspicion jurisprudence and impermissibly and unnecessarily reduces the State's burden of proof. I therefore dissent.

## I

I begin with common ground. The Fourth Amendment permits "brief investigatory" vehicle stops, *United States* v. *Cortez*, 449 U. S. 411, 417 (1981), on "facts that do not constitute probable cause," *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 881 (1975). To assess whether an officer had the requisite suspicion to seize a driver, past cases have considered the "totality of the circumstances—the whole picture," *Cortez*, 449 U. S., at 417, and analyzed whether the officer assembled "fact on fact and clue on clue," *id.*, at 419.

The stop at issue here, however, rests on just one key fact: that the vehicle was owned by someone with a revoked license. The majority concludes—erroneously, in my view—that seizing this vehicle was constitutional on the record below because drivers with revoked licenses (as opposed to suspended licenses) in Kansas "have already demonstrated a disregard for the law or are categorically unfit to drive." *Ante*, at 5. This analysis breaks from settled doctrine and

dramatically alters both the quantum and nature of evidence a State may rely on to prove suspicion.

## A

The State bears the burden of justifying a seizure. *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) (plurality opinion); *Brown* v. *Texas*, 443 U. S. 47, 51–52 (1979). This requires the government to articulate factors supporting its reasonable suspicion, usually through a trained agent. See *Ornelas* v. *United States*, 517 U. S. 690, 696 (1996); see also *United States* v. *Sokolow*, 490 U. S. 1, 10 (1989). While the Court has not dictated precisely what evidence a government must produce, it has stressed that an officer must at least "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Illinois* v. *Wardlow*, 528 U. S. 119, 123–124 (2000) (quoting *Terry* v. *Ohio*, 392 U. S. 1, 27 (1968)). That articulation must include both facts and an officer's "rational inferences from those facts." *Brignoni-Ponce*, 422 U. S., at 880, 884. A logical "gap as to any one matter" in this analysis may be overcome by " 'a strong showing' " regarding " 'other indicia of reliability.' " *Florida* v. *Harris*, 568 U. S. 237, 245 (2013). But gaps may not go unfilled.

Additionally, reasonable suspicion eschews judicial common sense, *ante*, at 5, in favor of the perspectives and inferences of a reasonable officer viewing "the facts through the lens of his police experience and expertise." *Ornelas*, 517 U. S., at 699; *Cortez*, 449 U. S., at 416–418 (explaining that the facts and inferences giving rise to a stop "must be seen and weighed . . . as understood by those versed in the field of law enforcement"); *Heien* v. *North Carolina*, 574 U. S. 54, 73 (2014) (SOTOMAYOR, J., dissenting) ("[O]ur enunciation of the reasonableness inquiry and our justification for it . . . have always turned on an officer's factual conclusions and an officer's expertise with respect to those factual conclusions"). It is the reasonable officer's assessment, not the

ordinary person's—or judge's—judgment, that matters.[1]

Finally, a stop must be individualized—that is, based on "a suspicion that the particular [subject] being stopped is engaged in wrongdoing." *Cortez*, 449 U. S., at 418; *Prado Navarette* v. *California*, 572 U. S. 393, 396–397 (2014). This does not mean that the officer must know the driver's identity. But a seizure must rest on more than the "likelihood that [a] given person" or particular vehicle is engaged in wrongdoing. *Brignoni-Ponce*, 422 U. S., at 886–887. The inquiry ordinarily involves some observation or report about the target's behavior—not merely the class to which he belongs. See, *e.g.*, *Navarette*, 572 U. S., at 398, 402 (upholding vehicle stop based on an anonymous tip about driver conduct, interpreted in light of the "accumulated experience of thousands of officers"); *Sokolow*, 490 U. S., at 10 (evaluating the collective facts giving rise to suspicion that an individual was transporting narcotics instead of relying on law enforcement's simplified drug courier " 'profile' ").

## B

Faithful adherence to these precepts would yield a significantly different analysis and outcome than that offered by the majority.

For starters, the majority flips the burden of proof. It permits Kansas police officers to effectuate roadside stops whenever they lack "information negating an inference" that a vehicle's unlicensed owner is its driver. *Ante*, at 1.

-----

[1] *Cortez* explained why this is so. Law enforcement officers, behaving akin to "jurors as factfinders," have "formulated certain commonsense conclusions about human behavior" as it relates to "the field of law enforcement." 449 U. S., at 418. A trained officer thus "draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." *Ibid.*; see also *United States* v. *Arvizu*, 534 U. S. 266, 276 (2002) (crediting officer assessment of driver behavior that was based on "his specialized training and familiarity with the customs of the area's inhabitants").

This has it backwards: The State shoulders the burden to supply the key inference that tethers observation to suspicion. The majority repeatedly attributes such an inference to Deputy Mehrer. *Ante*, at 4, 6, 9. But that is an after-the-fact gloss on a seven-paragraph stipulation. Nowhere in his terse submission did Deputy Mehrer indicate that he had any informed belief about the propensity of unlicensed drivers to operate motor vehicles in the area—let alone that he relied on such a belief in seizing Glover. *Ante*, at 1–2.

The consequence of the majority's approach is to absolve officers from any responsibility to investigate the identity of a driver where feasible. But that is precisely what officers ought to do—and are more than capable of doing. Of course, some circumstances may not warrant an officer approaching a car to take a closer look at its occupants. But there are countless other instances where officers have been able to ascertain the identity of a driver from a distance and make out their approximate age and gender. Indeed, our cases are rife with examples of officers who have perceived more than just basic driver demographics. See, *e.g.*, *Heien*, 574 U. S., at 57 (officer thought that motorist was " 'very stiff and nervous' "); *United States* v. *Arvizu*, 534 U. S. 266, 270 (2002) (officer observed an "adult man" driving who "appeared stiff"); *United States* v. *Ross*, 456 U. S 798, 801 (1982) (officer pulled alongside car and noticed that the driver matched a description from an informant); *Brignoni-Ponce*, 422 U. S., at 875 (officers stopped a vehicle whose occupants "appeared to be of Mexican descent"). The majority underestimates officers' capabilities and instead gives them free rein to stop a vehicle involved in no suspicious activity simply because it is registered to an unlicensed person. That stop is based merely on a guess or a "hunch" about the driver's identity. *Wardlow*, 528 U. S., at 124 (internal quotation marks omitted).

With no basis in the record to presume that unlicensed drivers routinely continue driving, the majority endeavors

to fill the gap with its own "common sense." *Ante*, at 5. But simply labeling an inference "common sense" does not make it so, no matter how many times the majority repeats it. Cf. *ante*, at 5, 6, 7, 8. Whether the driver of a vehicle is likely to be its unlicensed owner is "by no means obvious." *Ante*, at 1 (KAGAN, J., concurring). And like the concurrence, I "doubt" that our collective judicial common sense could answer that question, even if our Fourth Amendment jurisprudence allowed us to do so. *Ante*, at 3.

Contrary to the majority's claims, *ante*, at 3–5, 7, the reasonable-suspicion inquiry does not accommodate the average person's intuition. Rather, it permits reliance on a particular type of common sense—that of the reasonable officer, developed through her experiences in law enforcement. *Cortez*, 449 U. S., at 418. This approach acknowledges that what may be "common sense" to a layperson may not be relevant (or correct) in a law enforcement context. Indeed, this case presents the type of geographically localized inquiry where an officer's "inferences and deductions that might well elude an untrained person" would come in handy. *Ibid.*; see also *Arvizu*, 534 U. S., at 276 (prizing an officer's "specialized training and familiarity with the customs of the area's inhabitants"). By relying on judicial inferences instead, the majority promotes broad, inflexible rules that overlook regional differences.

Allowing judges to offer their own brand of common sense where the State's proffered justifications for a search come up short also shifts police work to the judiciary. Our cases—including those the majority cites—have looked to officer sensibility to establish inferences about human behavior, even though they just as easily could have relied on the inferences "made by ordinary people on a daily basis." *Ante*, at 6. See, *e.g.*, *Navarette*, 572 U. S., at 402 (pointing to "the accumulated experience of thousands of officers" to identify certain "erratic" behaviors "as sound indicia of

drunk driving"); *Wardlow*, 528 U. S., at 124 (permitting officers to account for the relevant characteristics of a location when interpreting whether flight from police is "evasive"); *Sokolow*, 490 U. S., at 9–10 (crediting the evidentiary significance of facts "as seen by a trained agent" to identify a suspicious traveler). There is no reason to depart from that practice here.

Finally, to bolster its conclusion as grounded in "common experience," the majority cites "empirical studies." *Ante*, at 4. But its use of statistics illustrates the danger of relying on large-scale data to carry out what is supposed to be a particularized exercise. Neither of the referenced reports tells us the percentage of vehicle owners with revoked licenses in Kansas who continue to drive their cars. Neither report even offers a useful denominator: One lumps drivers with suspended and revoked licenses together, while the other examines the license status of only motorists involved in fatal collisions. The figures say nothing about how the behavior of revoked drivers measures up relative to their licensed counterparts—whether one group is more likely to be involved in accidents, or whether the incidences are comparable—which would inform a trooper's inferences about driver identity.

As the concurrence recognizes, while statistics may help a defendant challenge the reasonableness of an officer's actions, they "cannot substitute for the individualized suspicion that the Fourth Amendment requires." *Ante*, at 4–5, n. If courts do not scrutinize officer observation or expertise in the reasonable-suspicion analysis, then seizures may be made on large-scale data alone—data that say nothing about the individual save for the class to which he belongs. That analytical approach strays far from "acting upon observed violations" of law—which this Court has said is the "foremost method of enforcing traffic and vehicle safety regulations." *Delaware* v. *Prouse*, 440 U. S. 648, 659 (1979).

The majority today has paved the road to finding reasonable suspicion based on nothing more than a demographic profile. Its logic has thus made the State's task all but automatic. That has never been the law, and it never should be.

## II

The majority's justifications for this new approach have no foundation in fact or logic. It supposes that requiring officers to point to "training materials or field experiences" would demand "'scientific certainty.'" *Ante*, at 3. But that is no truer in this case than in other circumstances where the reasonable-suspicion inquiry applies. Indeed, the State here was invited to stipulate to the evidence it relied on to make the stop. It could have easily described the individual or "accumulated experience" of officers in the jurisdiction. Cf. *Navarette*, 572 U. S., at 402. The State chose not to present such evidence and has not shown that it could not have done so. Accordingly, it has proved no harm to itself.[2]

In fact, it is the majority's approach that makes scant policy sense. If the State need not set forth all the information its officers considered before forming suspicion, what conceivable evidence could be used to mount an effective challenge to a vehicle stop, as the concurrence imagines? *Ante*, at 4. Who could meaningfully interrogate an officer's action when all the officer has to say is that the vehicle was registered to an unlicensed driver? How would a driver counter

---

[2] The majority suggests that requiring the State to supply the missing link between fact and suspicion would "considerably narrow the daylight" between the reasonable-suspicion showing and that required to establish probable cause. *Ante*, at 7. But that may simply be a feature of this unique context, where the difference between a permissible and impermissible stop turns on a single fact. Given that reasonable suspicion and probable cause are not "reducible to 'precise definition or quantification,'" *Florida* v. *Harris*, 568 U. S. 237, 243 (2013), the gradation between the two is bound to vary from case to case.

that evidence—by stating that they were of a different age or gender than the owner and insisting that the officer could have easily discerned that? And where would a defendant bring his arguments if the trial judge makes the key inference, or by the same token, fails to make an inference that "might well elude" the untrained? *Cortez*, 449 U. S., at 418.

Moreover, the majority's distinction between revocation and suspension may not hold up in other jurisdictions. For one, whether drivers with suspended licenses have "demonstrated a disregard for the law or are categorically unfit to drive" is completely unknown. And in several States, the grounds for revocation include offenses unrelated to driving fitness, such as using a license to unlawfully buy alcohol. See, *e.g.*, Ky. Rev. Stat. Ann. §186.560 (West Cum. Supp. 2019); Mont. Code Ann. §61–5–206 (2019); R. I. Gen. Laws §31–11–6 (2010). In yet other jurisdictions, "revocation" is the label assigned to a temporary sanction, which may be imposed for such infractions as the failure to comply with child support payments. Okla. Stat., Tit. 47, §6–201.1 (2011). Whether the majority's "common sense" assumptions apply outside of Kansas is thus open to challenge.

*     *     *

Vehicle stops "interfere with freedom of movement, are inconvenient, and consume time." *Prouse*, 440 U. S., at 657. Worse still, they "may create substantial anxiety" through an "unsettling show of authority." *Ibid.* Before subjecting motorists to this type of investigation, the State must possess articulable facts and officer inferences to form suspicion. The State below left unexplained key components of the reasonable-suspicion inquiry. In an effort to uphold the conviction, the Court destroys Fourth Amendment jurisprudence that requires individualized suspicion. I respectfully dissent.